# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>    Plaintiff,<br>v.<br>Paul Sayre,<br>    Defendant. | No. CR 08-61-TUC-RCC (JM)<br><br>**REPORT AND RECOMMENDATION** |

Pursuant to Minute Entry Order dated September 11, 2007, this matter was referred to Magistrate Judge Jacqueline Marshall for all pretrial matters. On January 9, 2008, Defendant Paul Sayre ("Defendant") was indicted as a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). *Docket No. 8.* On May 6, 2008, Defendant filed a Motion to Suppress. *Docket No. 17.* The Motion was heard by Magistrate Judge Marshall on August 26, 2008. Defendant was present and represented by counsel. One witness was presented by the Government, National Park Service Ranger Fletcher Ogg. Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that the District Court deny Defendant's Motion to Suppress Statements.[1]

## I.   FINDINGS OF FACT

On June 6, 2007, at approximately 1:11 p.m., Park Ranger Fletcher Ogg was patrolling Saguaro National Park west of Tucson in his service vehicle, a white Chevrolet Tahoe with a green stipe on the side, a light bar on the top and smaller blue and red lights in

---

[1] Trial in this matter is scheduled for September 23, 2008.

1  the grill. (Tr. 13-15 & 48.)² At approximately 1:00 p.m., Ranger Ogg was traveling
2  northbound on Sandario Road when he noticed that the driver of a southbound Chevrolet
3  Blazer was not wearing a seatbelt in violation of 36 C.F.R. § 4.15B. (Tr. 16-17.) On direct,
4  Ranger Ogg testified that the Blazer was white, but later agreed with defense counsel that,
5  based on what he had written in his report, that it was actually blue. (Tr. 17 & 61.)

6  Ranger Ogg then stopped and then proceeded to make a u-turn to get behind the
7  southbound Blazer. (Tr. 19-20.) At that time, he noticed that the Blazer began to accelerate
8  as Ranger Ogg pulled in several hundred yards behind. (Tr. 20.) Ranger Ogg was able to
9  see the Blazer at that point and saw that it was traveling at a high rate of speed and watched
10 as the driver made a right hand turn onto Manville Road by cutting across a dirt area before
11 the intersection in violation of 36 C.F.R. § 4.2. (Tr. 21-22.) The Blazer then returned to the
12 road and continued traveling westbound on Manville, but Ranger Ogg was unable to see him
13 due to the cloud of dust created by the turn through the dirt area. (Tr. 22-23.)

14 Ranger Ogg then made a right hand turn on Manville Road and observed the Blazer
15 stopped "a couple hundred yards down the road on the right hand side of the road." (Tr. 23.)
16 He then contacted dispatch to give them his location and, as he moved in behind the Blazer,
17 he activated his overhead lights and ran the registration. (Tr. 24-25.) As the Ranger pulled
18 in, the Defendant was at the rear of the Blazer "digging in the rear of the vehicle" with his
19 hands below the tailgate. (Tr. 25-26.) Ranger Ogg could not see what the Defendant was
20 reaching for, so he exited his vehicle and ordered the Defendant to stop digging in the car.
21 (Tr. 26-27.) The Defendant failed to comply and turned to look at Ogg. (Tr. 28.) Ranger
22 Ogg was then concerned because the Defendant had initially fled, continued to dig though
23 the back of the vehicle, failed to comply with his command, and, as Ranger Ogg then
24 noticed, had a knife clipped to his pocket. (Tr. 29.) He again commanded the Defendant to

---

²The transcript of the August 26, 2008, proceedings is designated "Tr." followed by the page number where the cited testimony appears; line numbers are included when quoting from the record.

- 2 -

1  stop what he was doing and the Defendant put his hands out and was told to put his hands
2  behind his back. (Tr. 29-30.) Ranger Ogg then approached the Defendant and placed him
3  in handcuffs. (Tr. 29.) He removed the pocket knife and patted down the Defendant. (Tr.
4  32)

5  Ranger Ogg then asked the Defendant if the tailgate of his vehicle came down and was
6  told it did. (Tr. 32-33.) He asked if he could open the tailgate, the Defendant replied that he
7  could, and Ranger Ogg then opened the tailgate so that the Defendant could sit down and
8  also so he could make sure there were no weapons in the area. (Tr. 33.) Before seating the
9  Defendant on the tailgate, Ranger Ogg visually swept the back of the Blazer and among other
10 things noticed the butt stock of a rifle in the cargo area right behind the back seat. (Tr. 34-
11 35.)

12 Ranger Ogg then inquired if there were any drugs or weapons in the vehicle. (Tr. 36.)
13 He asked about drugs because he was concerned that he might be stuck with a hypodermic
14 needle while retrieving the rifle. (*Id*.) The Defendant did not respond regarding drugs in the
15 vehicle, but told Ranger Ogg that there was a pistol in the center console of the vehicle's
16 front seats. (Tr. 36-37.) The Defendant also indicated that the rifle was actually a pellet gun.
17 (Tr. 37.) Ranger Ogg requested permission to see the rifle and confirmed that it was a pellet
18 gun and then secured it in his service vehicle. (Tr. 38.) The Defendant then gave Ranger
19 Ogg permission to retrieve the pistol from the center console. (Tr. 39.) The pistol was a .22
20 caliber revolver and was fully loaded. (Tr. 41.) Ogg unloaded the pistol and secured it in
21 his vehicle. (*Id*.) Dispatch later informed him that the pistol was not stolen. (Tr. 43-44.)

22 While he was talking with the Defendant, Ranger Ogg received word from dispatch
23 that the registration on the vehicle had been revoked. (Tr. 40.) He was also informed the
24 Defendant's driver's license was valid. (Tr. 42.)

25 After confirming the information with dispatch, which was about 10 minutes after he
26 initially sighted the Defendant, Ranger Ogg returned to the Defendant's vehicle and advised
27 Defendant of his *Miranda* rights, which he read from a card. (Tr. 44, 49 & 58.) At that

28

- 3 -

1 point, Ranger Ogg did not consider Defendant under arrest, but he was being detained and
2 was not free to go. (*Id.*) Ranger Ogg asked the Defendant if he understood his rights and the
3 Defendant indicated that he did, and also indicated that he was willing to talk. (Tr. 45.)
4 Ranger Ogg proceeded to ask the Defendant if he previously had been convicted of a felony,
5 and he indicated that he had not. (Tr. 46.) However, Ogg sought to confirm the Defendant's
6 representation with dispatch and was told the he had actually been convicted of several
7 felonies. (Tr. 46-47.)

After learning of the Defendant's prior felony convictions, Ranger Ogg placed him in the caged portion of his patrol vehicle and called for a tow truck to take the Blazer. (Tr. 47.) Ranger Ogg then searched the Blazer and found 45 rounds of .22 caliber ammunition. (Tr. 48.) He then transported the Defendant to the Ranger Operations Building on Kinney Road. (Tr. 47.) Once at the Operations Building, Ranger Ogg took the Defendant to an interview room and then left to obtain and review his criminal history. (Tr. 49.) He then returned to the interview room and, using a tape recorder he had in his pocket, recorded the interview of the Defendant. (Tr. 50.) He first asked the Defendant if he recalled that he had been read his *Miranda* warnings, and the Defendant said he did. (*Id.*) The Defendant also agreed to speak with Ranger Ogg without the presence of an attorney. (*Id.*)

**II.   CONCLUSIONS OF LAW**

Defendant contends that the search of his vehicle was in violation of the Fourth Amendment and that he was subjected to a custodial interrogation without first being advised of his constitutional rights under *Miranda*. Defendant thus contends that the evidence seized in the search and his statements must be suppressed. The government responds that the totality of the circumstances supported Ranger Ogg's decision to place Defendant in handcuffs for officer safety reasons while he conducted an investigation supported by reasonable suspicion.

### A. The stop was supported by reasonable suspicion that Defendant was violating traffic laws.

The Fourth Amendment prohibits "unreasonable searches and seizures" by the government. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). An investigatory stop need not be supported by probable cause in order to comport with the Fourth Amendment. Instead, an officer may perform such a stop if he has a reasonable and articulable suspicion that a suspect has committed a criminal offense. *See Terry v. Ohio*, 392 U.S. 1 (1968); *Hayes v. Florida*, 470 U.S. 811, 816 (1985). A traffic stop like the one as issue here is an investigatory stop. *See, e.g., United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000).

Here, Ranger Ogg testified that he initially decided to stop the Defendant because he was not wearing a seatbelt, a violation of 36 C.F.R. § 4.15(a). The Defendant then proceeded to leave the road to make his turn from Sandario Road to Manville Road, a violation of A.R.S. § 28-751. Because Defendant was violating these traffic laws, Ranger Ogg had reasonable suspicion and was justified in stopping him. *See, e.g., Whren v. United States*, 517 U.S. 806, 810 (1996).

### B. Ranger Ogg had reasonable suspicion to believe Defendant was involved in criminal activity.

To justify a *Terry* stop, an officer must point to specific and articulable facts which, taken together with rational inferences, reasonably warrant the intrusion. *Id.* In making reasonable suspicion determinations, courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *United States v. Cortez*, 449 U.S. 411, 417-418 (1981). This process allows an officer to rely on his own experience and specialized training to make inferences from and deductions about the cumulative information available that "might well elude an untrained person." *Id.* at 418; *U.S. v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000).

An investigatory detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). The

investigative methods employed in a *Terry* stop should be the least intrusive means reasonably available to verify of dispel the officer's suspicion in a short period of time. *Id.* When an officer makes a stop supported by reasonable suspicion, he is authorized to take such steps are reasonably necessary to maintain the status quo during the course of the stop. *Id; United States v. Osborn*, 203 F.3d 1176, 1181 (9th Cir. 2000).

Here, Ranger Ogg based his belief that criminal activity might be occurring on the facts that the Defendant had violated traffic laws, initially fled, was digging through the back of the Blazer, and failed to comply with his commands. (Tr. 29-31.) These factors generally, and the initial flight and the digging in the back of the vehicle especially, gave rise to a reasonable and articulable basis for Ranger Ogg to suspect that the Defendant was engaged in criminal conduct. Moreover, only about 10 minutes lapsed between the time Ranger Ogg first spotted the Defendant and the time that he advised Defendant of his *Miranda* rights. (Tr. 44, 49 & 58.) Thus, the investigatory detention was of short duration and involved only the steps necessary for Ranger Ogg to confirm his suspicion.

### C. The recovery of the handgun was justified.

In the absence of probable cause, the purpose of a protective search is to neutralize the threat of physical harm to police officers and others, *United States v. Barboza*, 412 F3d. 15, 16 (1st Cir. 2005), as well as to allow officers to pursue their investigation without fear of violence, *United States v. Bautista*, 684 F. 2d 1286, 1289 (9th Cir. 1982). Roadside encounters between police and suspects are especially hazardous in that danger may arise from the possible presence of weapons surrounding a suspect. *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). Even a protective sweep of a car's passenger compartment is permissible so long as the search is limited to those areas in which a weapon may be placed or hidden. *Id.* "The issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 1049 (internal citations omitted). The Fourth Amendment does not require suppression of evidence if, while

conducting a legitimate *Terry* search of the interior of an automobile, an officer discovers contraband other than weapons. *Id*.

As concluded above, Ranger Ogg's investigation was supported by reasonable suspicion. He was therefore entitled to conduct a protective search of the vehicle to neutralize any threat of physical harm. Additionally, as he was alone on the roadside, it was entirely reasonable for him to check for the presence of weapons in the vehicle. He looked only where he either saw, in the case of the pellet gun, or was told, in the case of the pistol, weapons would be present. Under the circumstances, Ranger Ogg's protective search was justified.

**D.    The Defendant was questioned based on the immediate danger exception to *Miranda*.**

The Defendant contends that he was subjected to a custodial interrogation without first being informed of his *Miranda* rights. To determine whether a person is "in custody" under *Miranda*, "a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citation omitted). However, a suspect may be questioned when an objectively reasonable need to protect the police or public from immediate danger exists. *New York v. Quarles*, 467 U.S. 649, 657 (1984).

In this case, Ranger Ogg asked about the presence of weapons and drugs out of concern for his safety. These are the sort of questions that have been categorized as falling withing this exception to *Miranda*. *See, e.g., Quarles*, 467 U.S. at 657 (police questioned suspect about whereabouts of weapon); *United States v. Reilly*, 224 F.3d 986, 992-94 (9th Cir. 2000) (same); *United States v. Carrillo*, 16 F.3d 1046, 1049-50 (9th Cir. 1994) (questioned suspect about possession of drugs or needles prior to search). Accordingly, there is no reason to suppress the statements made by the Defendant in response to Ranger Ogg's inquiry about drugs and weapons in the vehicle.

### III. RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE

Based on the foregoing, the Magistrate Judge recommends that the District Court, after an independent review of the record, **DENY** Defendant's Motion to Suppress [Docket No. 17].

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have ten (10) days within which to file a response to the objections. If any objections are filed, this action should be designated case number: **CR 08-61 TUC-RCC**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues. *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED this 12th day of September, 2008.

_____
Jacqueline Marshall
United States Magistrate Judge